

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RMT/UAD                         *271 Cadman Plaza East*
F.#2012R00387                   *Brooklyn, New York 11201*

February 23, 2017

By Hand and ECF

The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Alexander Posobilov
>       Criminal Docket No. 12-626 (SJ)

Dear Judge Johnson:

The government respectfully submits this letter in advance of the sentencing of defendant Alexander Posobilov, which is scheduled for February 28, 2017 at 9:30 a.m. As discussed further below, and as the government established at trial, for nearly a decade the defendant operated as the principal manager of ARC's day-to-day operations, which resulted in massive volumes of sophisticated microelectronics illegally being shipped overseas for use by the Russian military. As such, the government requests that the defendant be sentenced to a term of imprisonment within the advisory Guidelines range of 135 to 168 months – a significant term of incarceration that will both reflect the seriousness of his crimes and deter future criminal conduct by this defendant as well as others who may be similarly enticed to violate U.S. export control laws and endanger U.S. national security for their personal financial benefit.

I.     Offense Conduct As The Government Established At Trial

    A.     As A Leader Of The Conspiracy, The Defendant Lied And Directed Others To Lie Repeatedly To Mask The Military Nature Of The End Users And End Uses For Exported Microelectronics

As the government established at trial, ARC supplied microelectronics to several Russia-based client companies that were closely associated with the Russian military, including PEC, Apex and its subsidiaries, Neva and Atrilor. (GX 1322). In the course of obtaining these microelectronics, the defendant and other ARC employees under his direction routinely lied to suppliers regarding fundamental aspects of how the company

operated, including lies about the nature of the business, to whom the parts were being shipped, and for what use.  Through these lies, the defendant and his co-conspirators both evaded the attention of government authorities and induced vendors to continue selling microelectronics to ARC when they otherwise would have refused.

Because certain vendors would not have sold to ARC had they understood that ARC was merely a reseller, the defendant and other ARC employees repeatedly lied about the fundamental nature of ARC's business, claiming that ARC was a "contract manufacturer."  For example, when asked to confirm that ARC was a contract manufacturer, the defendant falsely told Kari McIntosh at the distributer Digikey in an email on February 16, 2011, "We will do pre-assembling before shipping to Taiwan, Fullmarks Technology will put them on the board and Russians facility will provides final assembling."  (GX 505).  Thereafter, in August 2011, the defendant continued to claim to McIntosh that ARC was a manufacturer, but was unable to answer even basic questions about ARC's purported manufacturing operations:

> MCINTOSH: Has it-- Do you do any of the builds there? You do builds there, don't you?
>
> POSOBILOV: No-no-no-no. It's . . . not-not here.
>
> MCINTOSH: What kind of builds do you do there? As a contract manufacturer?
>
> POSOBILOV: Uh, I don't remember. . . I can give you information for this.
>
> MCINTOSH: Ok.
>
> POSOBILOV: I will check up and then . . . then tell you.
>
> MCINTOSH: Ok.
>
> POSOBILOV: But, not right now. I need to contact my engineering department, which kind of [sighs] project they use.
>
> MCINTOSH: Oh, ok.

(GX 713.1(T)).  In addition, the defendant provided a fake document, which a co-conspirator called "pure forgery," to the manufacturer Hittite claiming that ARC was "an important part for our manufacturing."  (Tr. 2267; GX 503-E(T); GX 503-E.1-a1).

The defendant also routinely lied about the ultimate end users for the microelectronics he purchased in order to obfuscate the fact that the microelectronics ARC was acquiring were actually going to Russian military end users.  As established at trial, the

2

defendant and his co-conspirators falsely listed in end user certifications both Izhevsky Radio Plant ("IRZ"), (see, e.g., GX 15-I), and NIIR Federal State Unitary Expertise Radio Research Development Institute ("NIIR") (see, e.g., GX 126-B; GX 129-A).  Indeed, the defendant discussed with clients his intention to falsely provide NIIR as an end user (see, e.g., GX 113-D(T)), and directed Anastasia Diatlova to falsely provide that end user (see, e.g., GX 128.1(T); GX 128.2).

Similarly, to prevent suppliers from learning that NIIR was a fake end user, the defendants and other ARC employees frequently listed Russia-based co-conspirator Yuri Savin as an IRZ employee so that Savin could confirm IRZ was the end user if contacted – even though Savin was never an employee of IRZ.  (Tr. 2212; Tr. 1545).  Cooperating witness Victoria Klebanova testified that, under the defendant's direction, both she and other ARC employees falsely provided IRZ as an end user in order to purchase certain types of microelectronics.  (Tr. 999).  FBI analyst Richard Garodnick testified that ARC employees' emails contained hundreds of references to IRZ as the end user, but no indication that an ARC employee had ever communicated via email with an IRZ employee.  (Tr. 1557).  Further, the government introduced 16 invoices from microelectronics supplier Hittite Microwave Corporation reflecting Hittite's understanding that the end user for parts ARC was purchasing was IRZ, and that the point of contact at IRZ was Savin.  (See GX 102-E).

The defendant likewise provided false end uses to facilitate the purchase of equipment intended for military use.  For example, in an email dated April 4, 2011, the defendant wrote to an employee at supplier CTT, Inc. that certain controlled parts would be used for "Fishing Boat Radar Equipment."  (GX 109-B(T)).  When the supplier responded that a license would be required for those parts, the defendant forwarded that email to his Russia-based client at PEC, saying:

> These parts are under strict licensing requirements.
> Nevertheless, the manufacturer is ready to issue the license if
> the customer provides credible information about application,
> platforms used, etc.  Talk to your customer one more time.
> Present the prices, explain the terms.  Make sure that these are
> fishing vessels, and not the fishing-anti-submarine ones… Then
> we'll be able to start working.

(GX 109-B(T)).

A few months later, in August 2011, the defendant had a similar exchange with a client where they discussed what end use to provide the manufacturer Herotek. During an intercepted telephone call, the following exchange occurred:

POSOBILOV: Lena, who is the end user for Herotek?

LENA: Intek.

POSOBILOV: What is it again?

LENA: Intek, it's the same. [inaudible]

POSOBILOV: Intek?

LENA: Uh-huh.

POSOBILOV: What is it? A scientific organization? A manufacturing facility?

LENA: N-no... It's a ZAO [limited company].

POSOBILOV: What?

LENA: It's a ZAO [limited company]. These are the same... **They are making radars for naval... for the Navy... for some sort of nautical navigation purposes... like fishing. You can write down "for yachts". They involve navigation too.** There must be some sort of locators at least.

POSOBILOV: Uh-huh. [inaudible]

LENA: **Bottom-line, make up something to do with fishing. I think it's something that sounds very plausible, in my opinion.**

POSOBILOV: Okay.

(GX 112(T) (emphasis added)).  Thereafter, the defendant provided the following end use/end user information to Herotek:

> End User info:
> OOO Intek
> Sct.-Petersburg, 195221, Russia
> Application:
> **Fishing Boat Navigation Systems**

(GX 113-B (emphasis added)).

      After ARC was caught in the summer of 2011 having sent controlled parts to Russia without a license, Fishenko and Posobilov created Electrodevices in Singapore specifically for the purpose of evading U.S. export laws and defrauding manufacturers such as Hittite, who refused to sell to resellers such as ARC.  Posobilov was a Director of Electrodevices and held a 15% stake in the company.  (GX 405).  Posobilov made clear that

this was the purpose of Electrodevices in a December 2011 call with Diatlova, when Diatlova sought guidance as to how to acquire a controlled part. Posobilov instructed her to have Fishenko order it through Electrodevices. (Tr. 1990-92). As the evidence at trial demonstrated, when ARC employees had a hard time acquiring a part, they would ask Posobilov to purchase it. (Tr. 1974-76, 2270-72). Posobilov would place the order through Electrodevices and have the items delivered to a cargo warehouse in Singapore. (Tr. 2612). Once the items arrived in Singapore, Posobilov would instruct shipping company Inexpress as to where to send them. Often, they were simply shipped back to ARC before being exported from the U.S. to Russia. (Tr. 1976, 1979-80, 2612). In June 2012, Hittite caught onto this scheme and refused to do business with Electrodevices. In a call to Fishenko following the news, Posobilov said, "Hittite busted us." (Tr. 809).

> B.     The Defendant Exported And Supervised The Unlawful Export
>        Of Controlled Microelectronics

>        1.     IEEPA Violations

As established at trial, the defendant oversaw the export of several different types of microelectronics that were controlled under the International Emergency Economic Powers Act ("IEEPA"). He both supervised the ARC employees responsible for obtaining and shipping the components, and occasionally handled procurement himself.

As charged in Counts Two and Three, the defendant and his co-conspirators exported the export of 469 TI microcontrollers. At the time of the exports, this commodity was restricted for export to Russia under the ECCN 3A001.a.2.c, which meant that the product was capable of operating at extreme military temperature ranges. (GX 717; Tr. 720-22).

Count Four involved the export to Russia of an Analog Devices analog-to-digital converter. At the time of the export, this commodity was controlled under the ECCN 3A001.a.5.a.3, which meant that the product was capable of breaking down signals into very small bits very quickly for use in digital environments, rendering it useful in military applications. (GX 717; Tr. 720-22, 725). The defendant ordered this part himself from distributor Arrow on March 10, 2011. (GX 7-H). He also received an email from Avnet ("Avnet ship notice") confirming that the part had shipped. (GX 7-H.1). This ship notice also supplied the restricted ECCN of the part. Nonetheless, when the part was exported to Russia, the EEI stated once again that the shipment contained only EAR99 products.

Count Five involved the June 30, 2011 export of the same Texas Instruments microcontroller at issue in Counts Two and Three. It had the same 3A001.a.2.c at the time of this export. (GX 717; Tr. 720-22). There was an initial attempt to purchase the part through Digi-Key by Lyudmila Bagdikian on June 17, 2011. (GX 8-C). When Digi-Key refused to fulfill the request citing export restrictions (GX 8-C), Svetalina Zagon ordered the part through Avnet (GX 8-I). The defendant received the Avnet ship notice on June 18, 2011 indicating the item's restricted ECCN of 3A001.a.2.c. (GX 8-L).

Counts Six and Seven involved the export on July 14, 2011 and July 27, 2011 of 80 pieces of another Analog Devices analog-to-digital converter.  At the time of the exports, these items were restricted for export to Russia under classification 3A001.a.2.c, the same classification that applied to the item at issue in Counts Two, Three and Five.  (GX 717; Tr. 725).  The defendant himself directly placed the orders for these parts through Avnet.  (GX 9-B).  The parts were shipped to ARC in three separate shipments, and the defendant received Avnet ship notices for the shipment of these parts via email from Avnet on July 7, 2011 (GX 9-G), July 20, 2011 (GX 10-A), and July 22, 2011 (GX 10-E).

Count Eight involved the February 23, 2012 export by the defendant and others of ten pieces of a Micross memory chip with ECCN classification 3A001.a.2.C at the time of the export without the necessary license.  (GX 717).  As established at trial, the defendant and others actually obtained and exported this controlled part on at least two occasions – in February 2012 and in May 2012 – never obtaining a license for either export.

## 2.   AECA Violation

As established at trial and charged in Count Nine, the defendant violated the Arms Export Control Act ("AECA") through his involvement in the January 24, 2011 export of a Triquint amplifier controlled by the State Department as an item specifically designed for military use.  Although the defendant ultimately sought to stop this export, he did so only after the supplier discovered that ARC had exported the part without the required license.  At trial, the parties stipulated that at the time of export, the power amplifier was a "defense article designated on the United States Munitions List, because it was specifically configured for a military application, and had significant military applicability, and thus required a license for export."  (GX 4003).  The parties further stipulated that the amplifier is used in the nose of various fighter aircraft, including a Russian MiG fighter jet, and is used to aim the aircraft's weapons systems at multiple targets simultaneously.  (GX 4003).

## C.   Money Laundering

ARC received numerous wire transfer payments from its customers in Russia to pay for the electronic components sold by ARC, and that those monies were in turn used by ARC to purchase more components for further sales overseas.  FBI Financial Analyst Ronald Jones testified about his examination of ARC's banking records.  He found numerous wire transfers from overseas to ARC for the payment of goods exported by ARC.  (Tr. 2040-41, 2053-2057; GX 4-S; GX 4-S(T); GX 1341; GX 2004).  ARC did not receive these payments directly from its customers.  Rather, the payments were typically sent by unknown third parties through third party countries such as Cyprus, Belize, Nigeria and Hong Kong. (GX 1341).  Jones identified over $30 million in funds wired to ARC Electronics from overseas in this fashion.  (Tr. 2052).

The evidence showed that the defendant was extensively involved in ARC's finances, including receiving payments from customers.  SIA Garodnick testified that the ARC Quickbooks software had been set up to give the defendant permission to access the

"bank deposits" and "accounts receivables" modules within Quickbooks.  (Tr. 1768).  The defendant was also carbon copied on emails to Russian clients attaching invoices and emails from clients providing wire transfer information and also sent clients wire information.  (GX 4-S; GX 4-S(T); GX 9-I; GX 10-I; GX 16-M; GX 1394).  Additionally, the defendant was also on email communications with Russian clients advising them of how to send payments to ARC without raising red flags.  (GX 17-C; GX 17-C(T)).

II.     Sentencing Guidelines and Defense Objections

On October 26, 2015, the defendant was convicted by the jury on all counts. Based on these counts of conviction, the government concurs with Probation that the defendant's total offense level is 33, yielding an advisory Guidelines range of 135 to 138 months, assuming he falls within Criminal History Category I.

A.     Sophisticated Money Laundering Enhancement

In his sentencing submission, the defendant raises certain challenges to the Guidelines calculation set forth in the PSR.  First, the defendant argues that the Court should not apply a two-point enhancement for sophisticated money laundering under Guidelines § 2S1.1(b)(3).  (Def. Mem. 5-6).  This argument fails.  As the government established at trial, Posobilov and his co-conspirators at ARC employed:

- Fictitious entities and shell corporations;
- Two or more levels – layering – of transactions to make funds seem legitimate; and
- Offshore financial accounts.

ARC was paid by entities and shell companies located around the world who were not actually ARC customers.  (GX 1341).  As FBI Financial Analyst Ronald Jones testified, those entities and shell companies in turn used banks all over the world that were not in the same location as either the paying entities or ARC's customers in Russia.  Indeed, the evidence reflected numerous instances where different foreign entities would send funds to cover the same invoice.  For example, where Atrilor placed orders that appeared on one ARC invoice, ARC would receive fund transfers not from Atrilor, but from other companies to cover the parts on that invoice.

Further, in the later stages of ARC's illegal operation, Fishenko and Posobilov began to use Singapore-based Electrodevices to further obfuscate the financial side of the scheme:

- Electrodevices was effectively a shell corporation or alter ego for ARC – it had no employees beyond Posobilov, who was actually employed by ARC.  Posobilov and his co-conspirators used Electrodevices to purchase components from companies that would not sell to ARC, and to mask the source of funds used to purchase those parts.

- In addition, Fishenko and Posobilov used Electrodevices for layering funds coming into ARC from Russia. Funds from Russian customers would be wired into Electrodevice's account in Singapore, and then periodically ARC would move those funds into its US bank accounts, because that was less suspicious than the funds coming in directly from Russian customers.

At Fishenko's sentencing, the Court ruled that, based on the trial evidence, the money laundering at issue in this case was "sophisticated" under the Guidelines and applied the two-point enhancement under Guidelines § 2S1.1(b)(3). The Court should do so again in calculating Posobilov's advisory Guidelines range.

B.    Obstruction of Justice

Posobilov offers a perfunctory objection to the application of a two-level enhancement for obstruction of justice under Guidelines § 3C1.1. (Def. Mem. 6.) However, as the government established at trial, after Toshiba notified ARC that Toshiba intended to file a voluntary self-disclosure with U.S. export authorities, Fishenko and Posobilov deliberately set about scrambling to destroy the evidence of their illegal operation. During a call on August 4, 2011 between Posobilov and an employee at Apex, Posobilov asked whether the end user ARC had provided to Toshiba, Experimentalny Zavod, was the real end user, and the Apex employee said that he was not sure. Posobilov then explained that ARC could not provide a new end user to Toshiba without further raising suspicions, and that someone at Experimentalny Zavod would have to confirm that they were the end user for the Toshiba parts at issue in the VSD. (See GX 18-R.) Meanwhile, Fishenko instructed co-conspirator Sergey Klinov as Apex to manufacturer certain fake letters and remove evidence that Apex was a Russian military supplier from its website. (See GX 18-T; see also GX 18-W; GX 18-W.1.)

Accordingly, the government submits that the trial record amply supports the application of a two-point enhancement for obstruction under Guidelines § 3C1.1.

C.    Acceptance of Responsibility

Posobilov argues that he should receive a Guidelines reduction of three points for acceptance of responsibility, notwithstanding the fact that he put the government to its burden at trial and vigorously contested the government's proof during that trial. (Def. Mem. 6-7.) The government opposes this request. Posobilov could have pleaded guilty to the charges in the indictment, as Fishenko did. Instead, Posobilov chose to go to trial. The Court should award no Guidelines reduction for acceptance of responsibility.

D.    Application of Proposed 2017 Guideline Amendment

Posobilov also argues that that the Court should apply a proposed – but not yet enacted – amendment to the Guidelines that might result in a one-point reduction in his

offense level as a "first offender."  (Def. Mem. 7-8).  As this Amendment has not been – and may never be –  enacted, the government opposes this request.

III.    The Appropriate Sentence in This Case

The government submits that a sentence within this advisory Guidelines range of 135 to 138 months set forth in the PSR would be appropriate and just, given the defendant's leadership role at ARC, where he not only engaged directly in the criminal conduct occurring there, but also supervised and directed it.  Indeed, as established at trial, the defendant oversaw the export of tens of millions of dollars of microelectronics – much of it destined for use by the Russian military.  These efforts were critical to the Russian defense apparatus, which was unable to domestically manufacture such parts, including a sophisticated component that could be used in a fighter aircraft's phased radar array to allow it to track multiple airborne targets simultaneously.

Notably, and unlike certain of his co-conspirators who could claim that they lacked a detailed understanding of U.S. export control laws, the defendant was sophisticated in both his understanding and his efforts to circumvent those laws.  For years, the defendant repeatedly taught and directed other ARC employees to use false end uses and end users in order to obfuscate where parts were going and prevent U.S. authorities from stemming the flow of enormous volumes of microelectronics unlawfully through ARC to actors overseas.

Further, and significantly, the defendant's criminal conduct was not limited to his role as a leader and manager of ARC's microelectronics procurement and export scheme. He also facilitated ARC's money laundering operation, by which he and Alex Fishenko were able to better conceal ARC's ultimate customers from scrutiny by U.S. authorities and enrich themselves in the process.

Despite the defendant's extremely serious criminal conduct, the government is mindful of the 120-month sentence that this Court previously imposed on Fishenko.  As the government argued to the jury at trial, Fishenko's level of culpability was effectively equivalent to that of Posobilov.  In addition, unlike Fishenko – who timely accepted responsibility for his criminal conduct through his guilty plea to all charges in the indictment – Posobilov held the government to its burden and went to trial.  He therefore is not eligible for a Guidelines reduction under Section 3E1.1.

Taking into account all these factors, the government respectfully submits that a sentence below 120 months for Posobilov would be inadequate, would not satisfy the factors enumerated in Section 3553 – especially promoting respect for the law and providing general deterrence against similar criminal conduct – and would send a troubling and powerful message that this Court does not take seriously the defendant's criminal conduct. Accordingly, the Court should impose a sentence within the advisory Guidelines range of 135 to 168 months.

IV.     <u>Conclusion</u>

        For the foregoing reasons, the government submits that the Court should sentence the defendant Alexander Posobilov to a term of incarceration within the advisory Guidelines range of 135 to 168 months.

                                Respectfully submitted,

                                ROBERT L. CAPERS
                                United States Attorney

                        By:     ___/s/_____
                                Richard M. Tucker
                                Una A. Dean
                                Assistant U.S. Attorneys
                                (718) 254-6204/6473

cc:     Clerk of Court (SJ) (by ECF)
        Steve Zissou, Esq. (by ECF)